## 11066

### STATE v. TALLEY

#### (114 S. E., 859)

HOMICIDE—CONVICTION OF INVOLUNTARY MANSLAUGHTER HELD RESPONSIVE TO TESTIMONY.—In a prosecution for homicide, where the evidence for the State tended to show an intentional killing by defendant, and defendant testified that deceased attempted to take from defendant his gun, which he had been carrying concealed, and that after breaking away from deceased defendant stumbled and fell, and the gun was accidentally discharged, a conviction of involuntary manslaughter was responsive to the testimony and to the charge of the Court, which included a charge as to involuntary manslaughter by criminal negligence.

Before MOORE, J., Anderson.   September, 1922.   Affirmed.

T. J. Talley convicted of involuntary manslaughter, appeals.

*Messrs.   Wilson & Neely,* and *Rufus Fant, Jr.,* for appellant, cite:   *Carrying concealed weapon of itself insufficient to convict of involuntary manslaughter:* 77 S. E., 957; 64 L. R. A. 942; 1 Ann. Cas., 32.

*Mr. L. W. Harris, Solicitor,* for the State.

December 16, 1922.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The defendant was indicted for the murder of Irale Brown.   The jury found him guilty of involuntary manslaughter with a recommendation to mercy.   The Court imposed upon him the sentence of serving two years on the public works of the county, or a like term in the state penitentiary.   The defendant appealed on the following exceptions:

"(1) Because his Honor erred in charging the jury on the law of involuntary manslaughter and criminal negligence, when there was no evidence which would sustain a verdict of involuntary manslaughter, thereby suggesting to the jury a verdict of involuntary manslaughter based on criminal negligence, when there was no evidence to sustain such a verdict.

"(2) That the verdict of the jury was against the law and the evidence and without testimony to support it.

"(3) Because his Honor erred in refusing to grant defendant's motion for a new trial.   It is respectfully submited that the verdict is contrary to the law and the evidence.

"(4) Because his Honor erred in refusing defendant's motion for a new trial.   It is respectfully submitted that

there is no evidence to sustain the verdict of involuntary manslaughter.

"(5) Because the verdict is not responsive to the evidence, in that the testimony of the state, if believed by the jury, would be some evidence to sustain a verdict of murder or manslaughter, while that of the defendant was that the deceased came to his death by mischance, and there is no testimony or evidence of criminal negligence on which to base a verdict of involuntary manslaughter."

The defendant, T. J. Talley, testified as follows:

"The night of the killing—that day me and Irale was together; he was at my home, and I told him I would be over there to go to church with him. I went over there, and he was done gone to church. My brother went on to church with him, and I went on to the church, and went on around the house there, and met up with Rich Wynn and Rufus Smith, standing around the house there. I come on back and set down on the step of the church. Irale come out of the church, and just come right by me, and says, 'Is Rich Wynn here?' I told him 'No,' for I knowed what he had told me about Rich Wynn. I told him, 'No; Rich wasn't there.' And so, just after a while, me and him got up, and went across the yard there to smoke, and so there was two ladies come by us. Rich Wynn and Rufus Smith was standing out there, sort of towards that big tree in the yard standing out there. Irale says to me—says, 'Yonder is that son of a Rich Wynn right now; give me your gun; I am going to kill him; and I jumped from him, run off from him. Well he come on up to me, and he was behind me, and he grabbed the gun, and I grabbed it too. Well, I took the gun away from him. I told him, 'Irale, go on; you ain't going to get this gun.' Well, he run up again and caught around me. Well, I held the gun up this way from me. Well, I got loose from Irale, and I took his hand and pushed him that way, and just jerked loose. Well, it was rocky

there, and roots and things, and I fell right straight down to the ground. I had the gun that way, and when I hit the ground the gun shot, and Irale just went right on straight to the church, and these two boys out there went out through that cemetery running, Irale and I were on good terms; we were good friends; he was my buddy; never had any words with him in my life; he wanted my gun to shoot Rich Wynn about a girl; her name was Mary Lucas; Rich and Irale both went with her; I never went with her; she was my aunt. Neither Irale nor I did any cussing at each other out there; the only rough words were what Irale said about Rich; I did not mean to shoot Irale."

Cross-examination by the solicitor:

"Rich and Irale had had trouble; Rich Wynn and Rufus Smith had gone when the gun fired; I had the pistol in my pocket; Irale knew that I had the pistol that day, and he saw it that night. The pistol was in my hip pocket, with the barrel up; the barrel wasn't wrapped up in the handkerchief. I had the handkerchief wrapped around it, to keep grit out of it. I had the pistol with me when I went up through the pasture that morning; kept it in my pocket while I was plowing that evening. Irale and I had not had a falling out about a girl. When I went up to the church and danced some on the ground, when we ran off I was in front, I ran a little piece, and whirled, and dodged him, and he grabbed me; he grabbed around me this way, and tried to get around and get the pistol away from me; he grabbed the pistol by the barrel, and I grabbed it this way (indicating). He wasn't at my back. I had gotten the pistol away from him, and was holding it up in the air. I twisted this way to get lose from him, and pushed him, and started to go back out that way, where these boys were, and when I done that I fell, and that is when the gun shot; the handkerchief didn't come off the pistol when we were scuffling over it. I had the handkerchief with the powder burns on it down yonder at the jail, and it got away from

me somehow. I saw him when he walked off there and fell."

Nick Ellison, a witness for the state, thus testified:

"I was at John Wesley Church the night Irale Brown was killed. I didn't know exactly who killed him. As I started across the road, I seen Irale Brown come out the church door; he stepped down on the ground and commenced dancing, and the next time I seed him, him and T. J. Talley was running off up the hill towards a big oak tree. There was no one else in the direction they were running, except these two. I heard one of them say, 'Don't come upon me.' I didn't know which one it was, though. I didn't see a gun but heard one fire. One went one way, and the one that got killed went back toward the church."

Rufus Smith, a witness for the state, testified:

"I was out there at the church the night of the killing. I seen T. J. Talley when he shot Irale Brown."

Cross-examination:

"I didn't hear Irale say anything, when they ran up from the church; Talley said, 'Don't come upon me, —you.' Then he just fired. I saw him stick the pistol out at Irale, and shoot like that. I remember him bringing his hand up, about that far. Both of them were standing up."

At the close of the state's testimony, defendant's attorney announced in open Court that the defendant desired to enter a plea of guilty as to carrying concealed weapons. His Honor, the presiding Judge, charged the jury fully as to the law of murder, manslaughter, and involuntary manslaughter, including criminal negligence. The verdict of the jury was responsive to the testimony of the witnesses and the charge of his Honor, the presiding Judge.

Affirmed.